JOHN F. PURTELL *vs.* EBEN D. JORDAN & others.

Suffolk.   May 27, 31, 1892. — June 22, 1892.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Personal Injuries — Street Crossing — Due Care — Negligence.*

In an action for personal injuries alleged to have been occasioned to the plaintiff by the negligence of the defendants' servant, in driving too fast, when, by reason of the gathering darkness and the close proximity of a high loaded team, he was unable to see whether any one was on the crossing about to pass immediately before him, it was urged by the defendants that it is always negligent for a pedestrian in the streets of a city to attempt to cross behind a high loaded team until it has passed so far as to enable him to see that no other team is coming from behind it on the other side. *Held,* that the question whether there was negligence on the plaintiff's part, or on the part of the driver of the team, or on the part of both of them, was for the jury, and that while the plaintiff should take precautions, and endeavor to ascertain whether he was exposing himself to danger, the question as to what precautions were necessary was a matter of fact, and not of law.

TORT, for personal injuries occasioned to the plaintiff by being struck and injured by a horse and cart of the defendants.

At the trial in the Superior Court, before *Fessenden,* J., there was evidence tending to show that at about five o'clock on the afternoon of December 5, 1890, the plaintiff attempted to cross Harrison Avenue, in Boston, close to a loaded team called a "jigger," and was struck by another team coming from behind the former on the other side.   The plaintiff testified:

"As I came to the corner, just about got to the crossing to turn the corner of Oak Street to go down toward the Boston and Albany freight, coming up here, the avenue, I saw this team commencing to turn this corner.   [Referring to a plan.] I was standing then right here, if you will notice, calling this the curbstone.

"After coming from Mr. Brennan's store I stood right on this corner.   This heavy team, four-horse team, I don't know what you might call it, came right up here and turned down here, going on Oak Street towards the Boston and Albany freight, I suppose; I don't know where it was going, but it turned that way.   While I waited there on this corner there was a lady waiting here on the corner, waiting to come across to go up the

avenue, both of us waiting for this team to turn around. When the end of the team got out of my way, I leisurely turned across and up Oak Street, to go towards Washington Street, to cross Harrison Avenue. I had taken about three steps, or a little more, three or four, but I know I had got just about into the middle of the horse-car track.

" *Q.* Now indicate where you were. *A.* Well, I got about here. This is the horse-car rails. I got about here, and I heard a rumbling noise; in an instant I turned quick, like that, and I saw this team on to me. I made a grab; when I found I could not get either way, either beyond or back, I made a grab for the bridle; at the same time I hollered; then I heard hollering from, it seemed to me, both men. I don't know who it was, it was so dark, but I could see the covered team that was on top of me. It seemed that the man turned around as I hollered, and I think he had the reins only in one hand; then he put the two reins together; he pulled the horse up; at the same time I was taken off my feet, something hit me in the forehead; I don't know but that it was the shaft nearest to the sidewalk that hit me in the forehead; I let a scream out of me; I dropped the bridle also, and dropped at the horses' feet insensible. The next thing that I remember was finding myself in my dining-room and the kitchen, and two gentlemen, one on each side of me."

Edward Williams, fourteen years of age, a newsboy, testified as follows:

" *Q.* When did you see Mr. Purtell first? *A.* I did not see him until he was coming off of the curbstone, when he stepped off of the curbstone.

" *Q.* Do you remember of seeing any team there? *A.* There was a big jigger; it seemed to me it was going up Washington Street.

" *Q.* That was where? *A.* That was going from Oak to Washington Street.

" *Q.* You saw it go by, near Oak and Washington Streets? *A.* Yes, sir.

" *Q.* Did you see any other team besides that? *A.* No, sir; not that I can remember.

" *Q.* Did you see another team that hit Mr. Purtell? *A.* Yes.

" *Q.* Will you tell us about that, what you saw? *A.* I saw that coming down the avenue fast, very fast.

" *Q.* Coming how ?  *A.* Coming very fast.

" *Q.* Coming very fast ?  *A.* Yes, sir.

" *Q.* Which direction was it coming from ?  *A.* Coming from the South End.

" *Q.* How far was Mr. Purtell from the sidewalk when this hit him ?  *A.* He was about opposite the car track, I think.

" *Q.* Did you hear anybody say anything or until the time he was hit ?  Did anybody call out, or anything of that sort ? *A.* The driver, before he hit him, hollered out, and Mr. Purtell looked around, and the horse hit him and knocked him down.

" *The Court.*  I don't quite understand that.  You say —

" *The Witness.*  The driver hollered when he was hurt.

" *Q.* (*by the Court*).  The driver said what ?  He hollered, and you said something else, — what was that ?  *A.* Then Mr. Purtell looked around, and when he looked around this horse was on him.

" *Q.* (*by Mr. Achorn*).  Did you hear Mr. Purtell holler ? *A.* Yes, sir.

" *Q.* When did you hear him holler ?  *A.* When the horse hit him."

Patrick H. Burke, the driver of the team that struck the plaintiff, testified as follows : —

" *Q.* Then you had an opportunity to see quite a distance behind the team ?  *A.* I was looking at this team, the way it was working on lead there, the way the horses were working, and when I turned back I saw this man catch my horse's head.

" *Q.* When you turned back the man was there.  Now you were looking at the horses ; how many horses were there ? *A.* There were four.

" *Q.* What kind of horses were they ?  *A.* I should judge there were three dark brown horses, or dark bay, and a gray.

" *Q.* Anything peculiar about them ?  *A.* Not anything I noticed.

" *Q.* Anybody call your attention to one of them ?  *A.* The off horse was working rather hard going around.

" *Q.* Anybody call your attention to the off horse ?  *A.* I guess the boy made a remark about how he was working. [This boy was riding with the witness.]

" *Q.* Did n't the boy call your attention to that off horse just

before you undertook—  *A.* He made a remark about how the horse was working.

"*Q.* Just before you undertook to go by?  *A.* That was when I was further back that I was looking at the way the horse was working.

"*Q.* You looked at the gray horse to see how he was working?  *A.* I did.

"*Q.* And the boy called your attention and asked you to look at it?  *A.* He made the remark, 'See how that horse is working.'

"*Q.* And when you looked back, after looking at the gray horse, this man had hold of your horse's bridle, hadn't he?  *A.* Yes, sir."

The judge gave all the instructions to the jury asked by the defendants except the following:

"4. That if the plaintiff, standing where he was on Harrison Avenue, could not, before he attempted to cross the street, by reason of the position and movement of the large team, see vehicles coming down Harrison Avenue and approaching Oak Street, he was not in the exercise of due care in attempting to cross the street until such obstacle to his view was removed.

"5. If, when the plaintiff started to cross Harrison Avenue, he could not see defendants' team approaching by reason of the position of the large team, and attempted to cross so closely to the rear of the large team that he could not see defendants' team approaching until he got by the large team, he was not in the exercise of due care."

The jury returned a verdict for the plaintiff; and the defendants alleged exceptions.

*J. D. Ball & B. L. M. Tower,* for the defendants.

*L. M. Child,* for the plaintiff.

KNOWLTON, J.   There was evidence from which the jury might have found that the injury to the plaintiff was caused by the negligence of the defendants' servant in driving too fast, when, by reason of the gathering darkness and the close proximity of the high loaded team, he was unable to see whether any one was on the crossing about to pass immediately before him.  The jury might also have found that the plaintiff was using such care as persons of ordinary prudence are accus-

tomed to exercise under like circumstances. The court rightly refused to order a verdict for the defendants.

The defendants requested the presiding justice to instruct the jury as follows: " That if the plaintiff, standing where he was on Harrison Avenue, could not, before he attempted to cross the street, by reason of the position and movement of the large team, see vehicles coming down Harrison Avenue and approaching Oak Street, he was not in the exercise of due care in attempting to cross the street until such obstacle to his view was removed. If, when the plaintiff started to cross Harrison Avenue, he could not see defendants' team approaching by reason of the position of the large team, and attempted to cross so closely to the rear of the large team that he could not see defendants' team approaching until he got by the large team, he was not in the exercise of due care." It is urged, in behalf of the defendants, that it is always negligent for a pedestrian in the streets of Boston to attempt to cross behind a high loaded team until the team has passed so far as to enable him to see that no other team is coming from behind it on the other side. We cannot lay this down as a legal proposition. *Bowser* v. *Wellington*, 126 Mass. 391. *Shapleigh* v. *Wyman*, 134 Mass. 118. The circumstances of different cases so vary, and the natural and usual methods of crossing our crowded streets are so affected by facts and influences which are difficult of statement, and which are seldom found twice in the same combination, that there are few rules of law which can be arbitrarily laid down in reference to the effect of particular acts. When a pedestrian is run over by a team on a street, the question whether there was negligence on his part, or on the part of the driver of the team, or on the part of both of them, is usually a question of fact, to be decided by the jury. One passing behind a loaded team which obstructs his view has no such reason to apprehend danger from a team driven in the opposite direction, when he hears nothing, as he would have if he were crossing over one track of a railroad to another on which a rapidly moving train might be coming. Of course he should take precautions, and endeavor to ascertain whether he is exposing himself to danger. But in view of the rate of speed at which horses are ordinarily driven in crowded streets, and the

control which is usually exercised over them, to determine what precautions are necessary to prevent being run over is commonly a matter of fact, and not of law.

We are of opinion that the instructions requested were rightly refused.                    *Exceptions overruled.*